Good morning, and may it please the court, my name is Marcus Jackson, and I'm arguing on behalf of Appellant Mr. Richard Stiefel, actually Stiefel, but that's okay, we get that quite a bit. I think I will delve immediately into what I understand to be the court's foremost concern pursuant to the minute order that was circulated. Well, I wouldn't say foremost, but it is a case that does speak to one of the open issues, and so we wanted to make sure the party is prepared to address that. Okay, and so I will, as much as I am certainly eager and excited to talk about other issues, I think that was the point that was raised, and I will address that first. And that is the impact of the decision in the, I hope I'm pronouncing it right, Sorrell case versus California Water Service Company. On the face, that case is slightly different, because that is a case where the particular plaintiff never actually filed a claim with the EEOC. And for a number of reasons, which I still think are going to be helpful in this case, the court decided that, well, the fact that the requirement of the EEOC right to sue letter is, or the lack thereof, is not jurisdictional, as well as the appropriateness and effectiveness of the state fair employment practice agency right to sue letter, the court decided that that lack of the EEOC right to sue letter did not preclude the claims from going forward. In our case, just very briefly, Your Honors, of course, I've read the briefs, understand the facts, but this is a bit convoluted, because as Your Honors understand, there were actually, there have been two cases between the parties here. The initial one was 2006, and just by way of background, that case was primarily focused on a number of issues that were disposed of pursuant to federal enclave preemption, which I am very happy to never have to argue again, I hope, and not have to argue today. But it did include initially a claim under California law for disability discrimination because of having obtained a right to sue letter from the state agency, the Department of Fair Employment and Housing. Later that year, plaintiff obtained another right to sue letter from the state agency, and then immediately sought a right to sue letter from the EEOC. So what I want to point out is there was no federal EEOC administrative filing after the first DFDH right to sue letter, but there was after the second in late 2006. So if I'm, I want to make sure I've got this right. The first suit relates to sort of everything up to his, to the failure to rehire. Is that right? It's sort of discrimination on site, and the second claim is basically the failure to rehire claim. Is that correct? Really, for us, the second claim initially was intended to encompass everything, because the first right to sue letter from the DFDH. On the second claim, you do have a timely EEOC right to sue. So if that sort of moves it, and Sorrell is sort of irrelevant to us, right? Well, no, Your Honor, because I think defendants are taking the position that because a federal right to sue letter was not obtained following the initial state right to sue letter in early 2006, that all conduct in terms of incidents that would lead to claims of discrimination that were encompassed by the first right to sue letter were thereby waived and could not be pursued in the lawsuit following the second state right to sue letter, which led to the only EEOC right to sue letter. And the reason I think that Sorrell does matter is while here we have a situation where the EEOC was initially at some point contacted, defendants are still arguing that there's a waiver of some prior claims, whereby at that first right to sue letter, the EEOC was not contacted. Sorrell, to me, is very important because it gives, I think, not too much, but a substantial amount of deference to the state fair employment practice procedures. It also recognizes the authority and the effectiveness of the state procedures in terms of satisfying the federal administrative exhaustion requirement as well. And that deference is why. So your reading of Sorrell is that the first claims that were dismissed out of the 2006 suit are revived and we have to remand those to the district court? Well, not all the claims, Your Honor. Actually, this lawsuit, the appeal only pertains to the second lawsuit. The district court, as to the first lawsuit, dismissed the federal ADA claim, which was brought in by an amendment in late 2006, based on the fact that the plaintiff had not yet received an EEOC right to sue letter. And it turns out, pursuant to Sorrell, it doesn't matter. If you request it in your entirety. Okay. So now I'm really confused. Okay. What is it you want us to decide on this appeal today? Well, as to this issue, simply that the mere fact that someone has filed successive administrative charges does not preclude them from suing for all incidents of discrimination, including incidents that were covered by an earlier administrative charge. The first administrative charge from the state, there was no federal EEOC filing. The second, there was. In both charges, we are alleging that part of the discrimination was incidents preceding, including, and following the termination. Okay. So you don't really need Sorrell under that theory? No. Under that theory, I don't think we need Sorrell at all. However, this is why I think Sorrell is important. Deference to state administrative procedures. If the state issued a second right to sue letter, based on conduct that was included in a prior right to sue letter and charge, then that means that we are not precluded from pursuing damages for the termination and pre-termination discrimination, merely because there was an earlier right to sue letter from the state as well. There's no statute or case indicating that you get one shot at the apple when it comes to administrative agency exhaustion. Just like in filing lawsuits, people sometimes voluntarily dismiss without prejudice and then refile. You have the chance to come back later, as long as you're within the limitations period. The second DFEH charge and the subsequent EEOC charge fall within 300 days of Mr. Stiefel's termination. And that's what's important. And I think a clear example of why this has to be the case, that we should be permitted to still pursue relief for the termination and pre-termination discrimination, is in lawsuits, especially in employment lawsuits, we oftentimes learn a lot of interesting facts as we go along. And in a situation where someone starts out with, say, as here, a failure to accommodate claim, and then later learns a fact supporting an age discrimination claim, they would still have to exhaust their administrative remedies before they could add the age discrimination claim to an existing failure to accommodate lawsuit. By the logic the defendants are putting forward, by exhausting as to age discrimination and saying that the termination was based not just on disability, but on age discrimination as well, that would waive the ability to recover any damages to the extent the termination was based on disability, because the disability claim encompassing termination was already alleged in a prior administrative filing. And that simply can't be the case. Again, there's nothing precluding someone from filing a subsequent administrative filing, so long as the limits regarding time limits and, of course, number of employees are met, and there's no dispute that the time limit of 300 days and, of course, number of employees is easily met here, which is why the DFDA has accepted a second charge for filing. And as to that second charge of discrimination, an EEOC right to sue letter was obtained. That's the key. The second right to sue letter from the state was promptly followed up with a filing with the EEOC, making the second lawsuit, which is the lawsuit we're here discussing, filed in 2007. That's the lawsuit whereby a plaintiff is entitled to recover not just for discrimination on a monthly basis since April of 2006, but the discriminatory termination in March and a few weeks beforehand, in terms of not accommodating his disability by means of the various job assignments given to him after he was injured, which did not comply with his medical restrictions. So I will answer any questions on this, because I think it gets a bit convoluted because of two lawsuits, two administrative filings in the state, one with the EEOC, and as exciting as the administrative exhaustion issue is, we'd like to kind of resolve it, but I still want to make sure I leave time to rebut any points made by opposing counsel. I'm eager, of course, to answer questions on the more substantive issue of, you know, why summary judgment should have been denied, but I think the pleadings are very thorough on that, debriefing on that, but happy to address those questions as well. But I think by the looks on some of the panel members' faces, there might be some lingering confusion that I hope I can clear up as to the exhaustion of administrative remedies issue. Okay? If not, then again, I want to leave some time, but very briefly, on to the issue that admittedly has been a focus of a lot of attention and frustration for the better part of a year for me. I'd like to talk a bit about why the motion for summary judgment should have been denied. Quite frankly, again, we're dealing with an MSJ. The standard is triable issue of fact. Mr. Stiefel has offered evidence that as to him, he has been told repeatedly by numerous supervisors, including the safety manager, Mr. Jim Forrell, or I'm sorry, John Fanto is the name of the manager of safety. Did he actually talk with Fanto, or did he hear from somebody else about Fanto? Mr. Stiefel's testimony is John Fanto indicated after him. We also have a citation to another witness who has deposed a David Peabody who also heard from Mr. Fanto. Mr. Stiefel can't come back here unless he is 100 percent healed. Okay, no, wait. So what, so Mr. Stiefel does say that he talked with Mr. Fanto? On one occasion, yes. What did Mr. Fanto tell him on that occasion? Just, well, I'm not quoting exactly, but that he needs a full medical release, full medical release. So you say that's enough to make a disputable issue of fact. That's enough, definitely, because a policy, I mean, Ninth Circuit law cited it quite extensively, but a policy that an employee must be 100 percent healed is a per se violation of the law. No question about that. That may not solve your causation problem. I understand. And, frankly, it's the causation problem that I think is the biggest one for you to overcome, because in these facts it seems pretty clear that the hiring is done through the union, Paul. Yes. And on at least one occasion there was a specific request for plaintiff by name, and yet plaintiff was never sent by the union. Now, the plaintiff has explanations for that. Mr. Stiefel had other things he was going on, but fundamentally unless you can demonstrate that it would have been futile for him, I don't know how you make your causation case, and given that he was requested by name one time, I don't know how you can establish that it was futile or that he could reasonably have believed it was futile. Well, why don't we dispute it as a disputed issue of fact, given that communications from union back to the company are by facts, and there is no fact stamp on that particular form coming back saying Mr. Stiefel wasn't present. More importantly, that's kind of secondary. Mr. Stiefel is not challenging the union hiring process. He simply asked for the simple accommodation of ask for him by name, give him a phone call, let him know, hey, there's a work order for you. That's how it was done when he was initially hired. And if the defendant sincerely intended to hire him back, why would they let two lawsuits in more than three years go by with this whole dispute pointing to an alleged one-time requisition in August of 2006? The map lending case makes very clear. The duty to provide reasonable accommodation is ongoing and not satisfied by one single effort. Given that there are more than 1,000 people on this particular list that he was on, yes, he had some medical appointments, but most importantly, he has been repeatedly told by various managers, you can't come back here unless you're 100% healed. It is not unreasonable after frequent frustrations like that that Mr. Stiefel was not a regular attendant at the roll call. But the fact is, by claiming- Why is that the company's fault? If he doesn't get sent by the union and the people sent by the union are the people the company hires, it's not the company's selection as to who gets sent by the union. Where's the causation? Because under the Fair Employment, I'm sorry, under the Americans with Disabilities Act, they have the duty to provide a reasonable accommodation. And why is it unreasonable to be questioned by name, give him a simple phone call? And again, the duty to provide reasonable accommodation is not satisfied by one single effort. August 2006, many years ago, while Mr. Stiefel is still persistently asking people who tell him he can't come back here, the union is not the obstruction. I don't think you're really focusing on my question. If the people that are employed are the people that are sent from the union, and he's never sent from the union, and the company has nothing to do with that selection, at least in terms of who the union sends from their roll call, who is there to provide a reasonable accommodation for? If he gets sent, then they have a duty to provide a reasonable accommodation. But if he's never sent, how is it the company's fault for not providing that accommodation when he's never sent in the first place? Because the accommodation of asking for him by name, as they admit they can do by claiming they've done so once, and give him a simple phone call when he was first hired by this company. But is there anything that suggests that there's an affirmative duty to single somebody out from the union list? If they're looking for employees, the union provides the employees, what is it in the ADA that says someone who's disabled has to be favored by the company and they have to reach out and find him when he's not going to be sent in the normal course? Again, the premise of this is the people sent by the union aren't being sent because of any ADA violation. So where's the causation? Well, again, he's a disabled employee. Yes, there are a lot of people on the list, but a disabled employee is entitled to that accommodation and the simple accommodation of the call. Also, his colleague Mr. Stiefel... Are they required to affirmatively reach out and tell the union, we want to hire the disabled people? Not every disabled person, because some of the people fall off the list, are not seeking employment, are not even considered applicants. Mr. Stiefel has persistently, beyond at times initially showing up at the union, gone directly to managers at Bechtel asking, how can I get back to work? His colleague, Mr. Peabody, asked, I want to hire Richard. He's told he can't come back unless he's 100% healed. I understand that there's a concern about the union hiring process. Mr. Stiefel's fine with going through it, but what good is a union hiring process... But he didn't. That was sort of the problem. If he had been sent by the union and the company doesn't make accommodations, you've got a slam dunk. But he's never sent by the union, So why is the company supposed to be in a position to make accommodations for somebody who never shows up at their door? Well, on the one occasion they claim to have made a requisition for him, no, he was not there. Besides the fact that's a disputed issue of fact, it is the company, not the union, that is telling Mr. Stiefel and others, this guy can't come back unless he's 100% healed. The union can't force Bechtel to take anyone. If someone, the person... And Bechtel apparently can't force the union to use certain criteria in pulling people off the roll call. But your honor, Bechtel, as admitted, can request someone by name. There are two processes for being hired by the union. Does Bechtel have an obligation to request him by name? A general employee, no. But a disabled employee seeking work is entitled to a reasonable accommodation. Once he's an employee, but he's not an employee, Is Bechtel required to make an accommodation and to make that phone call to somebody who is an applicant? Yes, the way the law is written, applicant or employee, he's seeking work. But he's not disabled in any way that a phone call facilitates. If the man can work there, he surely can show up at the union hall and stand in line like everybody else. He wasn't asking for an accommodation in the standing in line process at the union hall. But he has on many occasions. The problem is on one occasion where they claimed to have asked for him by name, he was not present. And on the other occasions he wasn't selected by the union. The question we're trying to hone in on is what is it that requires the company to reach out and notify him separately or even identify him by name on a recurring basis? Why is there an obligation on the part of the company under the ADA to single out this employee for hire? Yes. Assume for the moment for the question. I realize you're disputing this. But assume for the moment if he shows up at their door, they'll make what accommodations they need to make to satisfy the ADA. But what is there in the ADA that requires him to go out and make sure he shows up at their door? Oh, wait. The way you phrase that is make sure. What I contend is that the ADA, as to disabled employees, requires the accommodation. The accommodation is good. Right. And they'll make the accommodation if he shows up at their door. But that's what the honesty. You're looking at the accommodation of, okay, he's got an injury. We'll find out something for him to do. The further accommodation is request them by name as they claim they've done and they can do and give them a simple phone call. And so my question is what in the ADA requires the employer to reach out affirmatively to the allegedly disabled employee as opposed to watching the people come from the union and dealing with them as they come? Well, because that's not providing any sort of accommodation. If one sits back, having told an employee many times you can't come back without a full medical release, and then when the person simply doesn't get hired, say it was through the union. The union is a red herring. He's always been in the package. That's a futility argument. That's an argument that Stiefel wasn't required to go over and sit over at the union hall because it would have been futile for him to have done so. Well, we're not contending he hasn't ever gone. He's gone quite a bit and at some point trailed off. And even despite being told many times you can't come back without a full medical release, he keeps asking other managers. I mean, the union is not the one saying full medical release required. The union has two processes. Either by your rank on a list, which is by regular attendance, you can get sent out for general requests, or you can be requested by name. They claim they requested him by name. So it's not an undue hardship to request him by name and have someone say, Richard, there's a work call for you tomorrow morning. That's when he first started. It may not be an undue hardship, but what requires them to reach out and make that affirmative effort? The Americans with Disabilities Act applies to employees and to applicants, neither of whom can be discriminated against based on disability. But how are they being discriminated against if they don't make affirmative phone calls to anybody else? Because anyone else who's not disabled... They're looking for 17 workers. Yes. They tell the union, send us 17. Now, they can give some names if they want to, but they just say, give us 17. Yes. They get their 17. They deal with those 17. Your client doesn't appear at the union hall. Your client's not among the 17. How has he been discriminated against? Because, as to that process by itself, he is still entitled to an accommodation of do something for this particular disabled employee. And that, in this case, would be, yes, call him by name. No, that suggests that they have an obligation to reach out and hire disabled employees of whatever, whether it's STFL or somebody else. I don't see that in the ADA. And Mr. Stifel's disability does not relate to anything that would affect his application in the ordinary way. The man is perfectly capable of showing up at the union hall because he demonstrated that he showed up at the union hall. Yes. So there's no requirement either on the part of the union, an independent question, or Bechtel to accommodate him in the application process. His disability doesn't relate to anything that affects his ability to apply for the job in the usual way, standing in line with everybody else at the union hall. As to standing in line, so in terms of his disability, yes. His disability does not preclude him from appearing. He has occasional medical appointments that made him miss it for that reason. But other than that, yes, he's physically able to appear at the hall. He's got a hand injury. So he's physically able to appear at the hall to appear for work calls. But the company is telling him he can't come back without a full medical release. A friend seeking to hire Richard Stiefel asked, can I hire him? Not without a full medical release. So we understand the union hiring procedures and we respect the importance there. I don't want that to be too much of a concern because Mr. Stiefel is fine with those procedures. But it's not the union that says you must have a full medical release to come back here. The union does not enforce that policy. The union is a hiring vehicle, and I hope that at least this court understands, but I think the district court didn't quite. We are not contending that Bechtel needs to go outside the union process, the normal union hiring procedures, in order to put Mr. Stiefel back to work. But the company does need to not tell him he must be 100% healed. That is a per se violation of two prompts of our claim here. One is saying you're disabled, we don't want you here. More importantly, it's saying you have a disability, we're not going to give you light duty, we're not going to give you any sort of accommodation. You just don't come back until you've got that full release. So as to your question dealing with the union hiring procedures, yes, Mr. Stiefel is fully able to go to the hall and hope at some point to be called to send over to Bechtel. The problem is the union can send him over, but the union can't barge through the door of San Onofre Nuclear Generating Station. Bechtel says you don't get in here without a full medical release. So we're kind of arguing about step one of a process that still ends with the full medical release policy of Bechtel being enforced and prohibiting Mr. Stiefel from returning to work. Well, it sounds to me, to make sure we're on the same page here without elaborating, it sounds to me like this does amount to a futility argument. That is, he justifies his non-appearance at the union hall and the fact that he wasn't sent by the union to the roll call process because he didn't think there was any point since he didn't think the company would hire him. Well, that is a large part of it since he's been told this repeatedly. His colleagues told him. I think not just a large part of it. It is. There's no other justification for his not appearing at the union hall. And if there's not an affirmative obligation on the company under the ADA to go out and hire him because he is disabled, then the only way that you can get by causation is if he can justify his non-appearance by futility. Is there another way you can get by the causation problem? I don't see it. And that's why I say a big part of the argument seems to me that's what it all boils down to at this point with regard to the rehiring element of your case, unless he can justify not appearing on grounds of futility. Yes. His non-appearance is not Bechtel's fault unless his non-appearance is due to this sense of futility. Well, the non-appearance would be in part due to futility, yes. The other thing that I understand Your Honor's position, and I've cited I think in the opening brief, the support. It's much stronger in California law admittedly, but under federal law as well some support for the argument that the disabled employee is entitled to preferential consideration for reassignment as opposed to, you know, someone new off the street. Mr. Bechtel, Mr. Stiefel, excuse me, repeatedly applied, asked for work, stayed on that union hiring list. And yes, you can't give special consideration to more than I think 1,200 people on a list, but not every single one of those 1,200 is someone who's known to be disabled, who's persistently asked about work, and who is seeking any chance to get back out there, including having friends ask to hire him, and always hitting the brick wall of our policies have to be 100% healed. So to the extent I think Your Honor's are focusing on the union part, I understand my disagreement would be, and I think it's addressed in the opening brief, that there is support that a disabled employee is entitled to preferential consideration for reassignment. Admittedly, the authority on this under federal law is not as strong as on the California level, which I can assure you I'm very familiar with or what I do. But anyway, I really want to reserve time. We've gone well over, so. Reserving won't work, but we'll give you time for rebuttal anyway. Thank you. That's our doing. Good morning, Your Honors. May it please the Court, my name is Tom McInerney, and I represent Beckel in this appeal. I'd first like to address the Sorrell point raised by the Court's order. Sorrell may have applied in Mr. Stiefel's first lawsuit. It doesn't apply here for multiple reasons. Again, it's important to understand that there were two lawsuits brought by Mr. Stiefel. The first one was filed in the San Diego Superior Court in June of 2006, and that was later removed. And it was dismissed by way of an appealable order by the district court on April 10, 2007. That order in part addressed the timing issue of his first DFEH charge and how he was time barred from bringing his federal claim. Mr. Stiefel, at that point, was able to bring an appeal at that point. But rather than contest that holding by the district court, he waited several months. Let me ask you, is my understanding correct that the ADA claims were dismissed without prejudice in the previous lawsuit? They were. And there's multiple holdings by various federal courts, federal appeal courts, that hold that dismissals without prejudice should be, as particularly in this case, should be appealable orders. For example. Fine. But if it's without prejudice, how are you bound? Well. I mean, that doesn't preclude the subsequent filing. In a completely sep- I think it does, Your Honor. In a completely sep- If he wanted to assert the federal claim, he was welcome to in the district court. But what he did was he waited several months until later in 2007, filed a completely new action in the San Diego Superior Court. And he didn't assert the Sorrell issue in that. He asserted that he had exhausted his administrative remedy in the EEOC by filing an EEOC charge in mid-2007, which was well more than 300 days after his first charge had been filed, and well over a year after he had been dismissed and terminated from Bechtel. So the complaint which initiated this second lawsuit, and we're here, alleged he exhausted his administrative remedy by filing an EEOC charge and receiving his right to sue letter on July 5, 2007, which was 16 months after he was laid off. The district court, in limiting, in a 12B6 motion, went through the procedural history and referred to its prior ruling that it had issued in the first lawsuit. Now, again, if the plaintiff, if Mr. Stiefel had disputed that ruling, what he should have done was appeal it, not launch a collateral lawsuit, and keep litigating in the district court. Why? If the dismissal is without prejudice, why are you obligated to appeal? Because there's a strong public policy, there's a strong policy of the courts to avoid fragmented litigation. And that's a dismissal with prejudice. If you have to appeal and otherwise can't bring it again, isn't that the meaning of with prejudice? Well, but there's also if, but if. I mean, just focus on this. How is it without prejudice if you're telling me if you don't appeal, you're barred from bringing the claim again? It is not, it is appealable and it should be appealed when the cure is not easily fixable. Well, that's still not focusing on the question. Whether or not it's appealable, whether or not our court would toss it out, whether it's an appropriate final order is a different question than whether or not you can bring the claim at some other time. And I'm asking, how is the dismissal without prejudice if, by not appealing at that time, you've waived the ability to bring the claim in the future? Well, because I. That's a dismissal with prejudice. No, but I believe, Your Honor, if when the dismissal with prejudice should, is intended to address issues and various cases addresses when the issue, the issue that led to the dismissal is easily fixable. And it's just a matter of going and correcting a flaw. But at this point, we are in mid-2007, and what. I have no idea what you just said. I really just do not understand the words that you put together. So I'm going to ask you to do that again. So if in mid, in April. We're talking about dismissal with or without prejudice right now. In April of 2007, the ADA claims were dismissed without prejudice because Mr. Stiefel said he had not exhausted, or his counsel said he had not exhausted his federal administrative rights. So what, at that point, what he did was then go to the EEOC, and we're talking a year and a half after his termination, and then, and filed an EEOC charge, and then has relied in the second lawsuit on that second, on that second. Did he get a right to sue letter from the EEOC? He did. Okay, well, if he's got a right to sue letter, then what's the problem? Because it was a year and a half. It was well after the time frame under the statutory provisions of Title VII. Why would the EEOC issue that if he was that way out of time? Because they said that there was, they didn't state, it's not clear, the record says that the reason it was issued because it was, they had determined that it would take more than 180 days for them to adjudicate that claim, and therefore they were going to issue him a right to sue. There's nothing else in the record under that. And do we get to look through right to sue letters from the EEOC? Look through them? We get to look through this and determine that he doesn't really have a right to sue because the EEOC should not have issued it? Absolutely. And frankly, I mean, this is not uncommon. When you're dealing with an overburdened agency such as this, they oftentimes will just issue a right to sue, and that doesn't mean that they address the full gamut of the allegations. I think this also underscores the fact that they issued a right to sue in mid-2007, and the fact that they never received the first, there was no actual, in effect, dual filing back in 2006, which was his first DFVH charge, because that begs the question, why would they issue a right to sue in mid-2007, a year and a half after he had been laid off, if, in fact, they had also had an initial filing? It doesn't make any sense, and I'm not going to suggest that there's any sense to it. But I would also like to raise this other point. There are at least two reasons why they might do that. One is that they didn't receive the first filing, but under Sorrell, it's possible they didn't have to because the state's filing was sufficient. The second is they did receive the first filing, didn't do anything with it, or even if they had, aren't barred from considering the same, a broader time period that encompasses the first time period on the occasion of the subsequent complaint. But I think the statute is fairly clear that the EEOC should not be addressing administrative charges filed in mid, a year and a half after the events in question, after the three-year time frame. And that also you may have a statute of limitations argument to bring to the Court, but I'm sitting here looking at this EEOC letter, and I'm trying to say, well, why is it the lawsuit can't be brought? It's got a right to sue letter. What's the barrier? What's the basis for saying you can't bring those? And I guess here we're talking about essentially the termination and pre-termination claims. How come you can't bring those? They got an EEOC letter. What's the problem? Because they are based on a, well, I think there are two reasons. One is the EEOC right to sue, it was untimely. It was in mid-2007. And then there's also a, and I think that's the primary one, you can't bring a legal action on federal claims that are beyond the 300 days that's set forth in this, in Title VII. So here the right to sue was filed in mid-2007. I think the other point I'd like to raise. Well, make sure I'm focusing on the right dates. It's mid-2007. When does the lawsuit get brought? The second lawsuit was October of 2007. It's not within 300 days? His termination was in March of 2006. But here I'm trying to segregate the different grounds for objection to the extent that the objection is that he didn't have an EEOC letter. He had an EEOC letter. It was four months, something like that, prior to the filing of the lawsuit. So your objection, I take it, is not to the EEOC letter being too far away from the lawsuit. It's to the underlying facts, which on the face of it appear to be covered by the EEOC letter. Yes. I mean, our argument is, and this underscores the point that this was never raised in the trial court nor in the appellate courts. And I'm about to ask you, where does the district court talk about this? Because I don't see anything. And that's the point of the district court dismissed this, without prejudice, on this issue in April of 2007. And they addressed the issue that I think should have triggered Sorrell, which was that the dual, you know, that's the argument that the initial DFEH filing, or it could have been made that that first filing in April of 2006 was deemed dual filed and therefore was timely. But what happened in that first lawsuit was, and it's in the district court's initial order, was that counsel for the plaintiff said he had acknowledged he had not exhausted his administrative remedies. So the court said, without prejudice, we'll allow you to exhaust your administrative remedies. What he did then after that was go to the EEOC. This is, again, a year and a half after his layoff from Bechtel. And then he attempted to exhaust it. That was untimely at that point. The other point I'd like to make is untimely, again, to be specific, untimely because it's too late to go to the EEOC? Yes. Now, what is it that prevents a party from coming to the EEOC with a broad range of complaints over a period of time? There is nothing that's in a, and this is a point raised by counsel, an individual can go multiple times to an agency to raise additional claims. And, in fact, to use the example of this case, he could go to the EEOC or the DFVH and bring a charge contesting his termination. And then months later he could say he was, they discriminated against him by not rehiring him. He could bring a charge on that claim. What you can't do and what you should not be allowed to do is just keep refiling the same charge. And because, and there's numerous federal cases on this, that you can't revive a time-barred claim just by going again and again to the administrative agency and say, issue me a right to sue. And let's also understand, or it's important to understand, the whole point of going to an agency. It's not just a technical requirement so you can get into court and sue immediately. There's a whole, you know, rubric of procedure that the administrative agency is supposed to engage in, conciliation and investigation and that sort of thing. Mr. Stiefel was never interested in that. He always asked for an immediate right to sue. And so when he was first time-barred and realized he hadn't exhausted his federal administrative rights, he then just went back again a year and a half later and filed a new EEOC charge. They issued him a right to sue. The form in the record says that they determined that they couldn't address it within 180 days. So they were going to issue him a right to sue, engage in no conciliation or investigation. By this point, he'd already had one lawsuit that was dismissed. And then when he got that second right to sue, he goes back to state court, repeats the same allegations, says now, you know, in July, I think it was, of 2007, I now have a right to sue. Let me repeat the same arguments I made before that were already dismissed. The other point I'd like to make is... But where I'm left adrift, and I realize I'm taking you over time, too, but we have little time today, what's wrong with that? He's got a right to sue letter. It doesn't limit the claims that can be brought. You make an argument that it should, but I'm not sure where in the law there's something specific that says the claims that were previously dismissed without prejudice can't be revived by going and getting the EEOC letter he said he was going to go get. Well, they can be revived by timely, by the compliance with the timely... Okay, so you're telling me it's not timely. But what exactly is the objection? What is it that justifies throwing out those claims, and, in fact, barring them with prejudice? He had not, Mr. Stiefel had not timely exhausted his administrative requirements with respect to the allegations leading up to his termination. But give some substance to timely. What's the requirement? What's the source of the requirement? The timely, you have under 2000E-5F1, you have 300 days from the alleged discrimination to bring an administrative charge with the agency. So here, and we initially got on this with the Sorrell argument, if his point was when he went to the DFEH in 2006, that should be deemed an EEOC filing, that should have been litigated in that first lawsuit. But what he did was that that was never presented, and instead he then waited until mid-2007, well after the 300 days, to go to the EEOC. And at that point he couldn't. And, you know, the agency, granted, issued him a right to sue because they said they weren't going to act upon it in a timely fashion, but it was still too late. And there's, you know, numerous cases by this court and others that have talked about, including in the Supreme Court decision in Morgan, that while these are technical requirements, they're important policy reasons why we make parties go to the agencies within a timely fashion. And there's also, I believe, policy arguments raised by this court's decision in Cleveland v. Douglas Aircraft and many other decisions that say that allowing parties to revive, to just file successive charges in order to revive time-barred claims would render these time limitations in Title VII meaningless because potential Title VII plaintiffs could evade the requirements simply by refiling their charges and say, look, I was timely with my second one, third one, fourth one. And the agency typically is going to keep issuing a right to sue letter. And the other point I would like to make on this issue of the Sorrell point is the fact that he also, I believe, waived this point by, this is never articulated in his opening brief. While the briefs may be read liberally, I understand there's no possible way to interpret his appellate brief as opposing the Sorrell-type issue, which is that the DFEH filing, the state filing, is automatically deemed dual-filed with the EEOC. He argued at page three of his opening brief that he exhausted his administrative remedies by filing a new EEOC charge in 2007, more than 300 days after the events in question. At page 41 of his brief, he argued that it was error by the district court, the error by the district court was that it never discussed the fact that a second DFEH charge had been filed and the EEOC submission was made within 30 days of the second federal right to sue. That's not the Sorrell argument. No reasonable reading of his appellate brief, in our view, triggers the Sorrell argument, which is the dual filing of the DFEH charge. And I realize I'm out of time if I... We've taken you there. Okay. If I... You can speak briefly to the other issue. Okay. Thank you, Your Honor. There is a strong policy in favor of upholding the process for hiring hall referrals. As set forth in our brief, Bechtel had negotiated collective bargaining agreements that obligated it legally to hire craft workers to the union hiring hall. The hiring hall method for referrals was, as I said, part of the collective bargaining agreement. And in a workplace regulated by collective bargaining agreements, in order to effectuate the national policy in favor of union management contractual rights, federal and disability and other discrimination statutes do not displace those contractual rights. In other words, there's no... And to address, I think, a comment made by Judge Bybee, there is no... The ADA is to put everyone on equal footing. It does not create additional rights that obligates Bechtel or any other employer subject to a collective bargaining agreement. What happens when Stiefel's been told, either directly or indirectly, that Bechtel won't hire him? Why does he have to go stand in line over at the hiring hall? Well, and I'm glad... The futility argument. First off, I would like to point out, in the record, I took Mr. Stiefel's deposition. I asked him why he didn't go to the union, why it took him several months to sign up. And what he said was it had nothing to do with futility. It said I had medical appointments and I had other personal commitments. Does the record reflect that he did go to the union hall on certain occasions? He did. And I asked him when. And he said later, in the summer of 2006, he went and signed up on the union hiring hall list. I asked him if he'd ever been referred out. He said no. I asked him why not. And according to his own testimony, he said he was never referred out because he wasn't there on the days that they had the call and therefore he always dropped to the bottom. Whether or not that's true, we may never know, but that's Mr. Stiefel's own testimony. He also, as the argument by counsel here, was that he was told by a John Fanto that essentially he wouldn't be hired. The court can look at the record. There's no, he never spoke to Mr. Fanto, or at least there's nothing in the record related to that. But his testimony was hearsay from a shop steward, other fellow union workers that they understood that there had to be a full medical release, and there was also one testimony from somebody who said hearsay from Fanto, a full medical release. But then when I pressed him, and this is important in his testimony, that that individual was Dave Peabody, who's a union employee. Would the hearsay be excludable at trial? I'm sorry, Your Honor? Would the hearsay be excludable? It would be, Your Honor. It can't be charged. It's an out-of-court statement. It cannot be charged to the company. It was the hearsay statement was made by a Dave Peabody who is not a union employee or is a union employee. It wasn't the hearsay.  And I would say that, and to answer that point, yes, that is not excludable if it's admissible. But what the point is, but the testimony from Mr. Peabody, and it's very important to look at it, he says when pressed, he said, I'm not really sure who said full medical release. I don't know where I heard that. That is his testimony, and we cited that in our summary judgment papers. And I did read it, and I didn't he acknowledged some uncertainty, but I didn't get the sense that the uncertainty was that Mr. Fanto said we're not hiring him back. There was some question about the phrase used and where that phrase came from. But unless there's something specific you'd point me to, I did not get the same impression reading the testimony that apparently you did. I did see something there that suggests it's admissible evidence that Fanto gave this report of some fashion. What exact words he used, I don't know. And I think the testimony is very equivocal. It said full medical by Fanto, then I'm not sure what is meant by full medical, and I wasn't sure where that full came from. And the point and the district court order on this addressed it. I think it would be a mistake even on summary judgment to assume, just let's assume it was said full medical release. That ergo, we do not hire disabled people. You need to have no limitations whatsoever. We know that from the evidence, from Mr. Stiefel's own evidence, that's not the case. We also know that in cases that, such as the Harris versus Hart and Harris case, where there may be some, you know, you have to get medical certification and show that you're without limitation, but that does not, that's, the intent is to trigger the interactive process. Mr. Stiefel wants the court to assume Bechtel would, there's evidence that Bechtel would not have hired them, and that's a completely unreasonable interpretation of the evidence. Excuse me. Really, it connects up to see if there's what I call his futility argument. In order to justify not actually appearing at the union hall enough to get sent for employment, he has to say there was no point because they weren't going to hire me anyway. Now, I've already heard the point you said with regard to what his own testimony was on that subject, but it seems to me he's going to try to connect it up at the back end. He has to establish some reasonable basis to believe in futility, and I understand this testimony being offered not as proof as to what Bechtel actually did, but as whether it gave him a reasonable basis for believing in no point showing up. And I don't disagree with what the Court's saying, with Your Honor saying. What I would say it has to be read, though, in context of Mr. Stiefel's other testimony and what we know to be undisputed facts, which are he was accommodated, he was allowed to work there with his arm in a splint. He also testified about numerous, several other workers he knew that were working there with disabilities. So your point is that both that it's not what he offered up when you asked him directly why he didn't appear, and that he could not have had a reasonable belief in futility based on what he independently knew. Yes, absolutely. And I would like to just make the final point. He didn't make the futility argument. They've never made the futility argument. Even in their appellate briefs, they never did. So to, you know, we may have addressed this more clearly in our opposition brief. It had been raised, but it never was. So thank you, Your Honor. Thank you. Unless the Court has other questions, I'll submit on the papers. We've made you earn your money today. Thank you. And now, Mr. Jackson, is there something more you want to say? Yes, Your Honors, thank you again. Just very briefly, just to address, I think, the points that the Court would be concerned about, as opposed to what I'm concerned about. The futility argument, even if not phrased as such, is addressed by the mentioning in the brief that it didn't make sense for him to keep appearing when he'd been repeatedly told that he wasn't going to be hired. What I want to talk is, and I'll go in reverse order, one of the points that was addressed extensively was the union hiring procedures and the causation issue. And Your Honors were asking questions about the causation issue. So, yes, we contend that it would have been futile. But separate and apart from that, we do have the testimony of Mr. Peabody. Separate and apart from whether anyone else at Bechtel should have reached out, this person wanted to. And this person was obstructed by being told he can't come back here. So I want to really draw the Court's attention to the fact that it's not simply a matter of Bechtel, I guess, tortfeasors deciding they're not going to reach out to this guy. It's, at some point, a friend of his who was in a, I think, a foreman-type position. He had some authority to try to recommend or make some hiring-type decisions. Asking about hiring Mr. Stiefel, and he was blocked. And then, lastly, because I think that causation was an issue Your Honors had concern about. The last point I want to get to is the final point, well, the first point we started with today. Sorrel, exhaustion of remedies, and I think there needs to be some clarification. Mr. Stiefel's first administrative charge was with the DFEH in March 2006, yes. But he filed a second DFEH charge in December of 2006. That is within 300 days of his termination. Once the DFEH issued a right to sue letter, which that agency does pretty much automatically. You get it right away, unlike the EEOC. Within 30 days of receiving that right to sue, he filed with the EEOC. And the record reflects this. The filing with the EEOC was in January of 2007. And actually, I guess the clearest place to find it would be in Appellee's supplemental excerpts of record pages 14 to 24. So it is not accurate to say that he didn't contact the EEOC until a year and a half after his termination. Let's get down to specifics, because that's exactly the argument that's being made. What's the date of his termination? March of 2006. When did he contact the EEOC? He first contacted the EEOC January of 2007, but again, applying Sorrell, the limitations period is told while one of the other of these agencies with a work sharing agreement is investigating. He went to the DFEH first in December 2006, walking 300 days. The DFEH says to pursue a federal claim, you must contact the EEOC within 30 days of receiving this right to sue letter. That he did on the 30th day of January 17, 2007. So I can't count the days here, but when we go back to do it, and I appreciate what you told us, you're telling us if we go back to do it, if we count up the days from his termination to his EEOC filing in 2007 and exclude the time period you say is told. Yes. We'll still be under 300. Yes, Your Honor. Now that goes back to the termination. I take it it's not going to reach back to what other pre-termination claims you might have. They're right at the edge. It actually would, Your Honor, because the pre-termination period, and I don't think I've been very descriptive, is about two weeks, Your Honor. He was given assignments that didn't meet his requirements, and then he's let go of medical reduction of force. The pre-termination period is not months. The pre-termination period is a couple weeks, because he was also injured in very late February of 2007. But you agree that we've got this 300-day limit with tolling. Yes. So if we count back from the EEOC filing in 2007, we can only go back 300 days plus tolling time. Yes, Your Honor. I think that's going to be enough to get us to the claim you're trying to make. Oh, yes. Okay. And unless there's other questions, that's all I had to address. We thank both of you for your arguments and your help today. The case just argued is submitted. And we'll now take up the final case in today's argument, Callender-Linn v. Mellon Long-Term Disability Plan.
judges: Noonan, Clifton, Bybee